UNITED STATES DISTRICT COURT         <u>**NOT FOR PUBLICATION**</u>
EASTERN DISTRICT OF NEW YORK

---

GREGORY MARQUESS d/b/a         <u>**MEMORANDUM AND ORDER**</u>
SKINITEMS.COM and SKINTRIGUE, INC.,

Plaintiffs,

     – against –              2:19-cv-04790 (ERK)

CARDFLEX, INC. d/b/a CLIQ, WELLS
FARGO BANK, N.A., U.S. ALLIANCE
GROUP, and JOHN DOES 1–10 INCLUSIVE,

Defendant.

---

KORMAN, *J*.:

Plaintiff Gregory Marquess d/b/a Skinitems.com (Skinitems) and a separate plaintiff, Skintrigue, Inc. (Skintrigue) — a company owned and operated by Marquess — filed a complaint alleging breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and fraud against all named defendants. Defendants Wells Fargo Bank, N.A. (Wells Fargo) and U.S. Alliance Group (USAG) move to dismiss Plaintiffs' amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 42, 44. Defendant CardFlex, Inc. (CardFlex) did not move to dismiss and instead filed an answer. ECF No. 5.

**BACKGROUND**

The following facts are accepted as true for purposes of this motion. *See Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). In order to frame

1

1   the facts, brief background on card processing drawn from the plaintiffs' complaint

2   is necessary.  As relevant here, "a [credit or debit] card transaction involves four

3   parties: (1) a cardholder, (2) an issuing bank, (3) an acquiring bank, and (4) a

4   merchant."  ECF No. 28 at 4 ¶ 20.  Both the issuing and acquiring banks are

5   members of a relevant card association like Visa or Mastercard.  A cardholder

6   receives his or her card from the issuing bank.  When a cardholder makes a

7   purchase from a merchant, that cardholder's issuing bank sends payment to the

8   acquiring bank, which in turn forwards it on to the merchant.  In order to accept

9   card payments, a merchant must find an acquiring bank willing to provide these

10   payment processing services.  In practice, many acquiring banks contract some or

11   all of their payment processing services out to third parties.  These "Member

12   Service Providers" (MSPs) agree to solicit merchants to sign up with an acquiring

13   bank, process payments on the acquiring bank's behalf, and assist merchants using

14   the acquiring bank's processing services.[1]

15       An example will illustrate the relationships.  First and Second Street Banks

16   are both members of the Visa card association.  Adam Smith applies for and

17   receives a Visa credit card from First Street Bank.  Corner Store contracts with

---

[1] Companies that provide only some of these services may be referred to by
different names such as Independent Sales Organizations or Card Processors.  ECF
No. 28 at 5 ¶ 21.  Those distinctions are not relevant here, and the memorandum
uses MSP as a catch-all term to avoid confusion.

1  Second Street Bank for Visa payment processing services.  When Adam Smith

2  buys coffee from Corner Store using his Visa, the bank that issues his card — First

3  Street — sends payment for the coffee to Second Street.  Second Street is said to

4  be the "acquiring bank" because it receives the payment.  Second Street then

5  forwards that payment on to Corner Store, the merchant who made the sale.  If

6  Second Street chooses to contract a third-party MSP to perform its card processing

7  services — say, Middleman, Inc. — then Middleman would receive the payment

8  for Adam Smith's coffee from First Street and forward it on to Corner Store on

9  Second Street's behalf.  In this case, plaintiffs allege that CardFlex acted as an

10  MSP on behalf of acquiring bank Wells Fargo to provide processing services for

11  the Skinitems website, and USAG acted in turn as the assignee and/or agent of

12  CardFlex.  ECF No. 28 at 5 ¶ 22.

13      The present case involves Marquess's attempts to secure a new MSP to

14  provide processing services for one of his skin care businesses.  Marquess owned

15  and operated Skintrigue, "an online seller of high-end, physician-exclusive

16  dermatology products."  ECF No. 28 at 5 ¶ 23.  Marquess also operated the

17  Skinitems website, which "was a discount website operating separate and apart"

18  from Skintrigue.  *Id.* at 5 ¶ 24.  In June 2010, Marquess began seeking new credit

19  card processing services for the Skinitems website.  *Id.* at 5 ¶ 24.  Marquess was

20  not seeking a new MSP to provide services to his other business, Skintrigue.  The

3

1    following month, Marquess's web designer connected him with David Ventura of

2    Dynamic Merchant Payments.  *Id.* at 5 ¶ 25.  Ventura represented that he could

3    obtain new card processing services for Skinitems.  *Id.*

4        Marquess filled out an application for a new MSP sent to him by Ventura.

5    ECF No. 28 at 6 ¶ 27.  At Ventura's request, Marquess provided certain

6    information to send to Wells Fargo, the prospective acquiring bank.  *Id.* at 6 ¶ 28.

7    In August 2010, Ventura told Marquess that the MSP did not want to approve his

8    application because it could not conduct an on-site inspection of his offices.  *Id.* at

9    7 ¶ 30.  Ventura said that he could find another processor that would approve

10   Skinitems while retaining Wells Fargo as the acquiring bank.  *Id.*  Marquess then

11   received an email from Cardflex asking him to finish a merchant application.  *Id.* at

12   7–8 ¶ 32.  Ventura assured Marquess that "CardFlex is one of the top-rated and

13   most respected merchant processors in the U.S."  *Id.* at 8 ¶ 36.  On August 14,

14   2010, Ventura emailed Marquess a one-page document, which Marquess signed

15   and returned because Ventura informed him that Wells Fargo needed it.  *Id.* at 8 ¶

16   38.  That document was the final page of the Program Guide attached to plaintiffs'

17   complaint, the full copy of which was not included in the email Ventura sent to

18   Marquess on August 14.  *Id.*

19       Three days later, Marquess received an email from CardFlex informing him

20   that his application was being processed.  ECF No. 28 at 9 ¶ 39.  Attached to that

4

1    email were two documents that Marquess was unable to open.  *Id.*  Marquess

2    would later discover that these documents were a copy of his completed merchant

3    application to CardFlex and the full Program Guide.  *Id.* at 9 ¶ 40.  The completed

4    merchant application contained an incorrect address and phone number for

5    Skinitems.  *Id.* at 9 ¶ 42.  This was significant because consumers may attempt a

6    chargeback if they do not recognize a merchant's information when it appears on

7    their credit card statements.  Marquess alleges that (1) Ventura copied all of his

8    information from the first MSP application to the Cardflex application, (2) forged

9    his signature on the latter document, and (3) acted as an agent for one or more of

10   the defendants in so doing.  *Id.* at 9–10 ¶ 43–46.

11         On August 23, the Skinitems website began processing online transactions.

12   ECF No. 28 at 14 ¶ 70.  The next day, Marquess received an email from CardFlex

13   confirming that his card processing account had been set up.  *Id.* at 15 ¶ 71.

14   Months later, on January 31, 2011, Marquess learned from a customer that

15   incorrect contact information was being provided by CardFlex to Skinitems

16   customers.  *Id.* at 15 ¶ 72.  Marquess contacted Ventura, CardFlex, and Wells

17   Fargo to request the information be updated in order to avoid chargeback attempts.

18   *Id.*  He would continue to contact these parties throughout 2011 and into 2012, but

19   the information was never updated.  *Id.* at 14–15 ¶ 74.

5

1    On February 11, 2011, Marquess received an email from an employee of

2    USAG informing him that USAG would be creating a reserve account for

3    Skinitems and would begin withholding ten percent of its monthly gross sales.

4    ECF No. 28 at 17 ¶ 77.  This was the first time that Marquess learned of USAG's

5    association with CardFlex.  *Id.*  Marquess refused to sign an authorization to create

6    the reserve account.  *Id.*  Nevertheless, over the next 21 months a total of

7    $33,562.12 was withheld from Skinitems and placed into the reserve account.  *Id.*

8    at 17 ¶ 79.

9    On February 14, 2011, Marquess received an email from an employee of

10   CardFlex informing him that Skinitems' account was being flagged for risk

11   because of multiple negative Address Verification Systems transactions.  ECF No.

12   28 at 17 ¶ 80. "A [n]egative AVS transaction occurs when the person attempting to

13   purchase merchandise using a credit or debit card enters incorrect information in

14   the billing fields for an address or zip code, either mistakenly or deliberately." *Id.* .

15   Marquess responded that it was the responsibility of the processor, not the

16   merchant, to identify and stop negative AVS transactions from settling.  *Id.* at 18 ¶

17   81.  The same day, USAG confirmed that it had received Marquess's request to

18   correct the contact information being provided to Skinitems customers, but again

19   failed to take any action to make corrections.  *Id.* at 18 ¶ 82.  Over the following

20   months, Marquess made several attempts to correct the contact information issue

6

1   by reaching out to CardFlex, USAG, and Ventura, as well as by traveling from

2   Texas to Florida to investigate the incorrect address in person.  *Id.* at 18–20 ¶¶ 83–

3   92.

4          On February 1, 2012, an employee of USAG emailed Marquess to tell him

5   that Wells Fargo had noted an increase in chargeback activity and requested an

6   explanation.  ECF No. 28 at 21 ¶ 93.  Marquess replied that the chargebacks were

7   being caused by the incorrect contact information being provided to Skinitems

8   customers.  *Id.*  The following month, 100% of the proceeds from Skinitems' sales

9   began to be withheld.  *Id.* at 21 ¶ 94.  Marquess contacted USAG, which

10  subsequently released the funds.  *Id.* at 21 ¶ 95.  Withholding resumed in

11  November 2012, and a total of $12,186.82 was withheld between November 1 and

12  termination of the account several weeks later.  *Id.* at 21 ¶ 98–99.

13         On November 26, 2012, USAG mailed Marquess a letter titled "Notice of

14  Account Termination," informing him that the Skinitems payment processing

15  account would be terminated effective that date.  ECF No. 28 at 22 ¶ 101.  The

16  letter also informed Marquess that USAG was assessing a termination fee of

17  $2,419.78.  *Id.*  Both the Skinitems and Skintrigue websites were immediately

18  unable to process credit or debit card transactions. *Id.* at 22 ¶ 102.  The Skintrigue

19  website stopped processing transactions even though it was operated independently

20  from the Skinitems website, had not switched MSPs, and was linked to a different

7

1    bank account.  *Id.* at 22 ¶ 102.  On the same date, a total of $123,941.43 was seized

2    from bank accounts belonging to Marquess and Skintrigue and the termination fee

3    of $2,419.78 was debited from the Skinitems merchant account.  *Id.* at 23 ¶¶ 103–

4    05. The Amended Complaint states that CardFlex debited the termination fee, but

5    does not state which defendant seized funds.  *See id.*

6         The following day, Marquess received a letter from the MSP providing

7    processing services to Skintrigue informing him that the account was being

8    terminated because Skintrigue had been placed on the Terminated Merchant File /

9    Member Alert to Control High Risk, or TMF/MATCH, list.  ECF No. 28 at 24

10   ¶ 107.  "The TMF/MATCH lists are essentially 'blacklists' that prevent merchants

11   with high-risk accounts . . . from opening a merchant account with an MSP."  *Id.* at

12   24 ¶ 108.  Marquess later learned that he was placed on the TMF/MATCH list by

13   "CardFlex at the request of Wells Fargo."  *Id.* at 25 ¶ 109.  The next month,

14   American Express also terminated processing services for both Skinitems and

15   Skintrigue.  *Id.* at 26 ¶ 114.  In January 2013, the dermatology products in

16   plaintiffs' inventories began to expire, causing a loss of $528.430.18, or

17   approximately $600,000 in estimated lost profits.  *Id.* at 26 ¶¶ 115–16.

18        Marquess then attempted to secure the return of the $169,496.32 still being

19   held in reserve.  ECF No. 28 at 27 ¶¶ 118–21.  In June 2013, CardFlex informed

20   Marquess that it was assessing an early termination fee of $145,111.09 and

8

1    consequently would only return $20,385.23 of the funds.  *Id.* at 28 ¶ 122.

2    Marquess attempted to meet with USAG, CardFlex, and Wells Fargo to resolve the

3    issue, including by travelling in person to offices in California.  *Id.* at 28 ¶¶ 123–

4    25.  CardFlex told Marquess he had incurred an early termination fee of

5    $165,111.09 and offered him a "50/50 settlement" of $82,555.54, which Marquess

6    refused.  *Id.* at 28–29 ¶ 126.  On July 2, 2013, an employee of CardFlex told

7    Marquess that it would assess an early termination fee of only $250 "per the

8    instructions of Ventura," and that the balance of the reserve fund would be

9    returned to Skinitems within 24 hours.  *Id.* at 29 ¶ 127.  To date, Marquess has not

10   been refunded any amounts from the reserve account or any other source.  *Id.* at 29

11   ¶ 128.  Marquess sued defendants in New York State Supreme Court, and the

12   action was removed pursuant to 28 U.S.C. §§ 1441 and 1446.  ECF No. 1.  Wells

13   Fargo and USAG now move separately for dismissal.

14                        **STANDARD OF REVIEW**

15           In deciding a motion to dismiss under Rule 12(b)(6), a court must "constru[e]

16   the complaint liberally, accept[ ] all factual allegations in the complaint as true, and

17   draw[ ] all reasonable inferences in the plaintiff's favor." *Elias v. Rolling Stone LLC*,

18   872 F.3d 97, 104 (2d Cir. 2017) (quoting *Chase Grp. All. LLC v. City of N.Y. Dep't*

19   *of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)).  "To survive a motion to dismiss, a

20   complaint must contain sufficient factual matter, accepted as true, to state a claim to

1    relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In

2    addition to the facts alleged in the Amended Complaint, the court may also consider

3    documents that plaintiffs have incorporated by reference.  *Chamberlain v. City of*

4    *White Plains*, 960 F.3d 100, 105 (2d Cir. 2020).

5                                           **DISCUSSION**

6    **I.     Fraud**

7           Plaintiffs advance two theories to support their fraud claim: (1) Ventura

8    made fraudulent representations and omissions while acting as an agent for

9    defendants, and (2) defendants entered into the contract with a concealed intent not

10   to perform.  To make out a fraud claim under New York law, a plaintiff must

11   allege "a representation of material fact, the falsity of the representation,

12   knowledge by the party making the representation that it was false when made,

13   justifiable reliance by the plaintiff and resulting injury." *Kaufman v. Cohen*, 307

14   A.D.2d 113, 119 (1st Dep't 2003).  In place of a misrepresentation, a plaintiff may

15   allege "acts of concealment where the defendant had a duty to disclose material

16   information." *Id.* at 119–20.  "[A] fraud claim that arises from the same facts as an

17   accompanying contract claim, seeks identical damages and does not allege a

18   breach of any duty collateral to or independent of the parties' agreements is subject

19   to dismissal as redundant of the contract claim." *Cronos Grp. Ltd. v. XComIP,*

20   *LLC*, 156 A.D.3d 54, 62–63 (1st Dep't 2017) (internal quotations and alterations

10

1    omitted).  In order to maintain a fraud claim in this posture, a plaintiff must either

2    (1) demonstrate a legal duty separate from the duty to perform under the contract,

3    (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the

4    contract, or (3) seek special damages caused by the representation and

5    unrecoverable as contract damages,  *Bridgestone/Firestone, Inc. v. Recovery Credit*

6    *Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

7         Fraud claims are subject to the heightened pleading requirements of Federal

8    Rule of Civil Procedure 9(b).  The rule requires that the pleading party must "state

9    with particularity the circumstances constituting fraud or mistake," while allowing

10   that "[m]alice, intent, knowledge, and other conditions of a person's mind may be

11   alleged generally."  Fed. R. Civ. P. 9(b).  To satisfy this standard, the complaint

12   must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

13   identify the speaker, (3) state where and when the statements were made, and (4)

14   explain why the statements were fraudulent."  *Lerner v. Fleet Bank*, 459 F.3d 273,

15   290 (2d Cir. 2006) (quotation omitted).

16        a.    *Intent Not to Perform*

17        Plaintiffs argue that the fraud and contract claims are not redundant because

18   defendants "had no intention of ever performing the agreement," but instead

19   intended to use it "as a subterfuge for conducting their wrongful scheme."  ECF

20   No. 42-4 at 19.  Plaintiffs maintain that these allegations are enough to sustain a

11

1    fraud claim at the motion to dismiss stage because the concealed intent not to

2    perform was a misrepresentation when made that is collateral to the contract.  *Id.*

3          Plaintiffs point to *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,

4    68 N.Y.2d 954 (1986), which held that "a promise made with a preconceived and

5    undisclosed intention of not performing it[] constitutes a misrepresentation" that

6    may be collateral to a contract.  *Id.* at 956.  More recent cases construing *Deerfield*

7    have held that "where the promised performance is an obligation of the promisor

8    under an enforceable contract between the parties, and the only damages sought are

9    those recoverable for a breach of contract, allegations of such an 'insincere

10   promise' are redundant of a claim for breach of the parties' contract and, therefore,

11   do not state a cause of action for fraud."  *Cronos*, 156 A.D.3d at 67 (quoting

12   *Castellotti v. Free*, 138 A.D.3d 198, 211 (1st Dep't 2016)); *see also Papa's-June*

13   *Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160–61 (S.D.N.Y. 1996) (collecting

14   cases); *Wilshire Westwood Plaza LLC v. UBS Real Estate Secs. Inc*, 94 A.D.3d

15   514, 516 (1st Dep't 2012).  This rule "guards against the erosion of the distinction"

16   between contract and fraud claims.  *Cronos*, 156 A.D.3d at 68.

17         Applying this reasoning, plaintiffs' claim fails because they do not allege an

18   insincere promise by defendants that is independent of defendants' obligations

19   under the agreement, and therefore collateral to the contract.  Unlike the insincere

20   promise in *Deerfield*, which was made orally to induce the promisee's assent to the

12

1    contract and was not included in its written terms, 68 N.Y.2d at 956, plaintiffs here

2    allege only that defendants never intended to perform their obligations under the

3    terms of the contract itself.  ECF No. 42-4 at 19; *see also DynCorp v. GTE Corp.*,

4    215 F. Supp. 2d 308, 325 (S.D.N.Y. 2002) (explaining that *Deerfield* "involved

5    parol representations concerning geographic restrictions limiting product resales

6    that were not contained in the contract, but which were not negatived by the

7    contract; hence, the parol representations were held 'collateral or extrinsic' to the

8    contract, and were thus enforceable").  Plaintiffs' fraud claim is wholly grounded

9    on promised performances that are "obligation[s] of the promisor[s] under an

10   enforceable contract between the parties" and is therefore redundant of their

11   contract claim.  *Cronos*, 156 A.D.3d at 67.

12          b.    *Special Damages*

13          Plaintiffs also assert that their fraud claim should stand because they seek

14   special damages in the form of lost profits, which defendants argue are barred by

15   the contract's limitation-of-liability provision.  ECF No. 42-4 at 18–19; ECF No.

16   28-1 at 20 ¶ 19.3.  A fraud claim may be sustained where a plaintiff "seek[s]

17   special damages that are caused by the misrepresentation and unrecoverable as

18   contract damages."  *Bridgestone/Firestone*, 98 F.3d at 20.  But here, plaintiffs seek

19   identical damages for both their contract and fraud claims.  ECF No. 28 at 32

13

1  ¶ 140, 36–37 ¶ 164.[2]  Plaintiffs fail to explain how damages they contend are

2  recoverable "under the contract measure of damages," *Papa's-June Music*, 921 F.

3  Supp. at 1161, could be considered "special damages" supporting a claim for fraud

4  under New York law.  *See Druyan v. Jagger*, 508 F. Supp. 2d 228, 239 (S.D.N.Y.

5  2007) (rejecting a similar argument because "[t]he only damages that plaintiff can

6  recover as a matter of law are not 'special' damages: they are precisely the

7  damages contemplated by her contract").

8        Plaintiffs rely on *Am. List Corp. v. U.S. News & World Report*, 75 N.Y.2d

9  38, 41 (1989) for the proposition that "lost profits are special damages" under New

10  York law.  ECF No. 42-4 at 18.  But that case reached precisely the opposite

11  conclusion about the damages there claimed by the plaintiffs, and the language

12  upon which the present plaintiffs rely describes a position the court rejected.  *See*

13  *Am. List Corp*, 75 N.Y.2d at 42, 44 (rejecting "at the outset defendant's contention

14  that the courts below improperly awarded plaintiff 'lost future profits' which are

15  special damages" and concluding that "plaintiff has sufficiently demonstrated that

---

[2] The fact that plaintiffs included a demand for punitive damages does not change the outcome. *Cf. Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 793 (2d Cir. 1986) ("[w]ithout a finding that [plaintiff] could not recover punitive damages as a matter of law, [the district judge] erroneously construed the fraud claims as identical to those in contract").  Here, plaintiffs sought punitive damages as part of both their contract and fraud claims, so the presence of that demand does not "distinguish[] the fraud claims from those [sounding] in contract." *Id.*

14

1   the moneys it seeks . . . are general damages flowing as a natural and probable

2   consequence of the breach [of contract]").

3         Plaintiffs have provided no authority establishing that they can support a

4   fraud claim by recasting contract damages as special damages in anticipation of an

5   affirmative defense to recovery.  Indeed, the existence of a contractual bar to the

6   damages now portrayed as "special" precludes this type of creative pleading. *See*

7   *DynCorp*, 215 F. Supp. 2d at 327 (noting that "DynCorp's allegation of [special]

8   damage is not legally sufficient" because the contract specified that no party would

9   be liable "for any consequential, special, or punitive damages, including loss of

10   future revenue or income, or loss of business reputation" as the result of a breach).

11   I do not reach that ground for dismissal because plaintiffs have failed to specify

12   any special damages distinct from those they seek under the contract itself.

13   Plaintiffs have failed to plausibly plead facts satisfying any of the

14   *Bridgestone/Firestone* factors, and their fraud claims addressed directly to

15   defendants are dismissed as redundant of the contract claims.

16         c.   *Ventura's Representations and Omissions*

17         Finally, plaintiffs contend that Ventura, acting as agent for one or more of

18   the defendants, made collateral misrepresentations and omissions of material fact.

19   ECF No. 28 at 34–35.  Plaintiffs allege that Ventura (1) falsely represented that the

20   first MSP to which Marquess applied was not willing to perform an on-site

1   inspection required for approval of his application, (2) falsely represented that

2   CardFlex was a "top-rated" processor, and (3) failed to disclose that CardFlex

3   caters to high-risk merchants, was the subject of a Federal Trade Commission

4   investigation, and was involved in multiple lawsuits with merchants.  *Id.*

5        Plaintiffs have failed to adequately allege facts supporting the inference that

6   Ventura acted as agent for defendants with respect to these representations and

7   omissions.  Under New York common law, an agency relationship "results from a

8   manifestation of consent by one person to another that the other shall act on his

9   behalf and subject to his control, and the consent by the other to act." *Bigio v.*

10  *Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (internal quotation omitted).

11  Agency authority may be either actual, where it arises from a direct manifestation

12  of consent by the principal to the agent, or apparent, where the conduct of the

13  principal reasonably causes a third person believe that the principal has consented

14  to the agency's performance of an act.  *Meisel v. Grunberg*, 651 F. Supp. 2d 98,

15  110 (S.D.N.Y. 2009).

16       It is unclear which theory plaintiffs believe applies in this case.  Plaintiffs

17  alleged the bald legal conclusion that "Ventura acted as an agent for one or more of

18  the Defendants."  ECF No. 28 at 10 ¶ 46.  But "[t]he unsupported statement that

19  [Ventura] acted as an agent on behalf of [defendants] is insufficient to allege an

20  agency relationship." *Meisel,* 651 F. Supp. 2d at 121.  The complaint contains no

16

1   factual allegations indicating that Wells Fargo or another defendant ever granted

2   Ventura actual or apparent authority to act as its agent.  Nor does the complaint

3   contain factual allegations that Ventura acted at the direction, or under the control,

4   of Wells Fargo or another defendant, from which such a grant of authority might

5   be plausibly inferred. Plaintiffs also allege that "each Defendant was the agent of

6   the other and, with respect to Defendant's actions and omissions, were acting

7   within the course and scope of such agency and/or by contract or operation of

8   law." ECF No. 28 at 2 ¶ 11.  But "[b]road allegations that several defendants

9   participated in a scheme, or conclusory assertions that one defendant controlled

10  another, or that some defendants are guilty because of their association with others

11  . . . do not satisfy Rule 9(b)." *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569

12  (S.D.N.Y. 1996).

13      Plaintiffs argue that "[t]o the extent 'direction and control' is an issue, it is a

14  question of fact that would not serve as the basis for dismissing Plaintiffs' fraud

15  claims." ECF No. 42-4 at 16 n.9.  That might be true if plaintiffs had made any

16  factual allegation that Ventura was subject to the direction or control of any

17  defendant, but they did not do so.  *Cf. Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F.

18  Supp. 2d 217, 225 (S.D.N.Y. 2013) (allegations that, *inter alia*, one party

19  established a binding code of conduct for, and "exercised managerial authority"

20  over, another party were sufficient to plausibly allege agency); *Cumis Ins. Soc., Inc*

17

1    *v. Peters*, 983 F. Supp. 787, 796 (N.D. Ill. 1997) (allegations of an agreement

2    under which an agent would collect debts on behalf of the principal and account to

3    him for monies collected were sufficient to allege the existence of an agency

4    relationship).  Whether an agency relationship exists is generally "a mixed

5    question of law and fact," but that does not excuse plaintiffs from carrying their

6    burden to plead facts from which one could plausibly infer the existence of such a

7    relationship.  *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 79 (2d

8    Cir. 2019).

9         Plaintiffs argue that their allegation that Ventura may have received

10   compensation for introducing Marquess to CardFlex was sufficient to allege an

11   agency relationship.  ECF No. 42-4 at 15–16.  This argument fails for at least two

12   reasons.  First, the Amended Complaint states only that "[t]o the extent Ventura

13   received compensation . . . that compensation was paid by one or more of the

14   Defendants" because "Marquess did not compensate Ventura."  ECF No. 28 at 9

15   ¶ 45.  This language fails to allege even that Ventura was actually compensated by

16   defendants, much less specify which of the defendants paid any such

17   compensation.

18        Second, even if plaintiffs had directly alleged that one or more defendants

19   compensated Ventura, the fact that one party compensated another would not be

20   enough to plausibly allege the existence of an agency relationship without some

18

1    other indicia of consent to act or direction and control.  Indeed, compensation is

2    not even a required feature of an agency relationship.  *See* Restatement (Second) of

3    Agency § 441 cmt. a ("Unless the circumstances create a restitutional duty, a

4    principal has no duty to pay compensation to an agent for services rendered in the

5    absence of a promise to pay for them").

6         In a related argument, plaintiffs attempt to analogize the situation to the

7    agency relationships involved in insurance transactions.  Under New York law, an

8    "insurance agent" is the agent of an insurance company, while an "insurance

9    broker" is the agent of an individual insured, and compensation generally flows

10   from principal to agent.  N.Y. Ins. Law. § 2101(a), (c).  Insurance agents solicit

11   sales on behalf of insurance companies, while brokers are engaged by individuals

12   or corporations seeking policies from insurance companies.

13        If anything, this comparison works against plaintiffs.  The factual allegations

14   in the complaint indicate that Marquess sought out Ventura's assistance to find him

15   a better processing deal by looking at options offered by various companies, which

16   would make Ventura analogous to an insurance broker, not an insurance agent.

17   ECF No. 28 at 5–6 ¶¶ 24–26.  The fact that plaintiffs did not compensate Ventura

18   and do not know the source of any possible compensation does not change that the

19   complaint alleges that they, and not the defendants, originally engaged Ventura's

20   help in this matter.

1      ## II.      Other Causes of Action Asserted by Marquess

2      Wells Fargo seeks dismissal of Marquess's claims for unjust enrichment and

3      breach of the covenant of good faith and fair dealing as redundant of its contract

4      claim and, with respect to the unjust enrichment claim, as time-barred.  In addition,

5      Wells Fargo seek dismissal of Marquess's contract claim to the extent it seeks

6      damages beyond what they contend is allowed under the limitation of liability

7      provision of the contract.  As Wells Fargo notes, the factual predicates for the

8      claims defendants seek to dismiss are integrally related to Marquess's contract

9      claim and arise out of the same facts.  Wells Fargo does not contest the sufficiency

10     of the basic contract claim at this stage, and instead seeks only partial dismissal of

11     that claim based on the relief sought.

12     Partial dismissal of a contract claim on the basis of a limitation of liability

13     provision may sometimes be appropriate on a Rule 12(b)(6) motion.  New York

14     courts have granted analogous motions for partial dismissal pursuant to CPLR

15     3211 "to the extent [a contract claim] seeks damages above the amount allowed

16     under the contractual limitation of liability clause." *Electron Trading, LLC v.*

17     *Morgan Stanley & Co.*, 157 A.D.3d 579, 579 (1st Dep't 2017).  That approach

18     results from the combination of CPLR 3211(a)(1), which permits a motion for

19     dismissal on the ground that "a defense is founded upon documentary evidence,"

20     and New York law holding that "[c]onstruction of an unambiguous contract is a

20

1   matter of law, and the intention of the parties may be gathered from the four

2   corners of the instrument and should be enforced according to its terms." *Beal*

3   *Savs. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007).  Federal courts have granted

4   relief similar to that available under CPLR 3211 on both Rule 12(b)(6) motions to

5   dismiss and Rule 12(c) motions for judgment on the pleadings.  *See, e.g., Nirvana*

6   *Int'l, Inc. v. ADT Sec. Servs.*, 525 F. App'x 12 (2d Cir. 2013); *Media Glow Dig.,*

7   *LLC v. Panasonic Corp.*, 2018 WL 2175550, at *1 (S.D.N.Y. May 11, 2018);

8   *Constellation Brands, Inc. v. Keste, LLC*, 2014 WL 6065776, at *4 (W.D.N.Y.

9   Nov. 13, 2014); *Pacs Indus. v. Cutler-Hammer, Inc.*, 103 F. Supp.2d 570, 573

10  (E.D.N.Y. 2000).  Conversely, other judges have held that "damages are not an

11  element of a cause of action" and therefore cannot be challenged by a Rule

12  12(b)(6) motion that only "tests the legal sufficiency of allegations . . . not the

13  request for relief." *Alevsky v. GC Servs. Ltd. P'ship*, 2014 WL 1711682, at *1

14  (E.D.N.Y. Apr. 30, 2014) (Gleeson, J.); *see also Bontkowski v. Smith*, 305 F.3d

15  757, 762 (7th Cir. 2002) (Posner, J.) ("[T]he demand [for damages] is not itself a

16  part of the plaintiff's claim . . . and so failure to specify relief to which the plaintiff

17  was entitled would not warrant dismissal under Rule 12(b)(6).").

18       It is not necessary to decide which approach is most appropriate here.

19  Because the contract claim will have to be tried in any event, it would "make[]

20  little sense to grant a motion to dismiss as to one or more of [the other claims], as it

21

1    may prove necessary to hold yet another trial in the event that it is determined on

2    appeal that the motion to dismiss was improperly granted." *Thibodeaux v. Travco*

3    *Ins.*, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014).  As Judge Clark observed,

4    "fragmentary disposal of what is essentially one matter is unfortunate not merely

5    for the waste of time and expense caused the parties and the courts, but because of

6    the mischance of differing dispositions of what is essentially a single controlling

7    issue." *Audi Vision Inc. v. RCA Mfg.*, 136 F.2d 621, 625 (2d Cir. 1943).

8    **III.    Causes of Action Asserted by Skintrigue**

9           Wells Fargo separately seeks dismissal of all claims brought by separate

10   plaintiff Skintrigue, including the breach of contract claim.  As discussed above,

11   Skintrigue is an entity owned and operated by Marquess separately from the

12   Skinitems website.  Plaintiffs have failed to adequately allege that Skintrigue was a

13   party to the contract or show that it was otherwise entitled to sue upon it.  In New

14   York, "[a] non-party may sue for breach of contract only if it is an intended, and

15   not a mere incidental, beneficiary" of the contract, and "the parties' intent to

16   benefit the third party [is] apparent from the face of the contract." *LaSalle Nat'l*

17   *Bank v. Ernst & Young LLP*, 285 A.D.2d 101, 108 (1st Dep't 2001).

18          Plaintiffs allege, upon information and belief, that "Skintrigue was an

19   unauthorized guarantor" of the other plaintiffs and was therefore a

20   "party/guarantor" under the contract.  ECF No. 28 at 30 ¶ 134; ECF No. 42-4 at 24.

1    Skintrigue's name appears nowhere in the contract documents submitted by

2    plaintiffs.  *See* ECF No. 42-2.  In addition, the contract expressly provides that

3    "[n]othing in this Agreement is intended to confer upon any person or entity other

4    than the parties any rights or remedies, and the parties do not intend for any third

5    parties to be third-party beneficiaries of this Agreement."  ECF No. 28-1 at 25

6    ¶ 31.8.  Plaintiffs cannot now circumvent the clear language of the contract by

7    attempting to confer the status of "party/guarantor" upon Skintrigue because "there

8    is a question concerning how Defendants had authority [to] seize funds" from its

9    bank account.  ECF No. 42-4 at 24.  Skintrigue's failure to establish its right to sue

10   upon the contract is necessarily fatal to its cause of action for breach of the

11   covenant because "[w]ithout an underlying binding contract[] there can be no

12   breach of the implied covenant of good faith and fair dealing."  *Kilgore v. Ocwen*

13   *Loan Serv., LLC*, 89 F. Supp. 3d 526, 534 (E.D.N.Y. 2015).  The motion to dismiss

14   Skintrigue's other causes of action is denied because those claims are integrally

15   related to the surviving causes of action asserted by Marquess.

16       **IV.    Causes of Action Asserted Against U.S. Alliance Group**

17           In its separate motion, USAG — the alleged agent or assignee of CardFlex

18   — seeks dismissal of all claims against it on the ground that plaintiffs failed to

19   plausibly allege facts establishing its relationship with CardFlex.  ECF No. 44-1 at

20   6.  USAG says that the "fatal deficiency" in plaintiffs' allegations is "that they are

23

1   literally nothing more than conclusory allegations that are completely unsupported

2   by any factual allegations whatsoever, such as the source of the information upon

3   which the allegations are based, or the reasons for Plaintiffs' belief upon which the

4   allegations are based." *Id.* at 9.

5       The *Twombly*/*Iqbal* standard requires that a complaint "contain sufficient

6   factual matter, accepted as true, to state a claim to relief that is plausible on its

7   face." *Iqbal*, 556 U.S. at 678 (internal quotation omitted).  That standard demands

8   "factual amplification where needed to render a claim plausible," *Arista Records,*

9   *LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010), but it does not follow that

10  plaintiffs here were required to plead the sources of its information or explain "the

11  reasons for Plaintiffs' belief upon which the allegations are based."  ECF No. 44-1

12  at 9.  *Arista* itself confronted allegations made "upon information and belief" and

13  found them sufficient.  604 F.3d at 120–21.

14      Plaintiffs alleged, upon information and belief, that "at some point

15  subsequent to when CardFlex began rendering merchant processing services to

16  Plaintiffs, USAG became CardFlex's assignee and/or agent with respect to the

17  rendering of those services."  ECF No. 28 at 16 ¶ 76.  They then provided "factual

18  amplification" for that allegation by alleging, *inter alia*, that USAG emailed

19  plaintiffs to inform them that a reserve account would be set up pursuant to the

20  terms of the contract, confirmed receipt of plaintiffs' requests to update merchant

24

1    information provided to customers, and finally sent them a letter terminating

2    payment processing services and assessing an early termination fee.  *Arista*, 604

3    F.3d at 120; ECF No. 28 at 17–22 ¶¶ 77, 82, 101.   The combination of these

4    allegations was more than enough to "make[] the inference of [USAG's]

5    culpability plausible."  *Arista*, 604 F.3d at 120.

6         USAG appears to argue that *Arista*'s allowance of allegations made upon

7    information and belief must be cabined to contexts where "the facts are peculiarly

8    within the possession and control of the defendant."  ECF No. 44-3 at 6.  As noted

9    above, *Arista* also says that this style of pleading may be appropriate "where the

10   belief is based on factual information that makes the inference of culpability

11   plausible." *Arista*, 604 F.3d at 120.  That is simply a restatement of *Iqbal*'s

12   requirement that plaintiff plead "factual content that allows the court to draw the

13   reasonable inference that the defendant is liable for the misconduct alleged."  556

14   U.S. at 678.  Here, the factual information provided by plaintiffs easily makes

15   plausible the inference that USAG was an agent and/or assignee of CardFlex under

16   its agreement with plaintiffs, and could therefore be liable for the misconduct

17   alleged.

18        Finally, USAG faults plaintiffs for filing a "shotgun" complaint that fails to

19   sufficiently specify which claims and factual allegations are aimed at which

20   defendants.  ECF No. 44-1 at 10.  It is true that parts of the complaint are

25

1    frustratingly vague about exactly which defendant is alleged to have committed

2    which actions.  In many cases, this inartful pleading appears to be the result of

3    plaintiffs' inability, using the information currently available to them, to precisely

4    assign responsibility for every action given the shifting constellation of parties

5    involved in processing their transactions.

6        Regardless of the reason, none of the potential confusion arising from the

7    pleadings is so serious that it merits dismissing the affected claims wholesale.  This

8    is not a case where "a failure to more precisely parcel out and identify the facts

9    relevant to each claim materially increased the burden of understanding the factual

10   allegations underlying each count." *Weiland v. Palm Beach Cty. Sheriff*, 792 F.3d

11   1313, 1324 (11th Cir. 2015).  Indeed, USAG never made a motion for a more

12   definite statement, which is available in cases where a pleading "is so vague or

13   ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P.

14   12(e).

15                          **CONCLUSION**

16       The motions to dismiss are granted in part and denied in part.  The cause of

17   action for fraud is dismissed for failure to state a claim.  Skintrigue's causes of

18   action for breach of contract and the covenant of good faith and fair dealing are

19   dismissed for failure to state a claim.  Plaintiffs' causes of action for negligence,

20   conversion, and making materially false and misleading statements in violation of

26

1    N.Y. Gen. Bus. Law § 349(h) — which they conceded are time-barred, ECF No.

2    44-2 at 5 n.1 — are dismissed with prejudice.  Plaintiffs are granted leave to

3    replead within 30 days of the date of this order.

4                                                        **SO ORDERED.**

5    Brooklyn, New York                          *Edward R. Korman*
6    February 2, 2021                            Edward R. Korman
7                                                United States District Judge

27